KEKER & VAN NEST, LLP
R. JAMES SLAUGHTER - #192813
MICHAEL K. STERN (*Pro Hac Vice* Pending)
710 Sansome Street
San Francisco, CA  94111-1704
Telephone:  (415) 391-5400
Facsimile:  (415) 397-7188
Email:  rslaughter@kvn.com

Attorneys for Defendant
ELECTRONIC ARTS INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PEOPLE AGAINST DRUGS AFFORDABLE PUBLIC HOUSING, INC. DBA/PAD MOTOR SPORTS/GREEN LIGHT RACING,<br><br>Plaintiff,<br><br>v.<br><br>ELECTRONIC ARTS, INC. DBA EA SPORTS,<br><br>Defendant. | Case No. C-07-4693-MMC<br><br>**DEFENDANT ELECTRONIC ARTS INC.'S NOTICE OF MOTION AND MOTION TO DISMISS OR, ALTERNATIVELY, TO STRIKE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: November 9, 2007<br>Time: 9:00 a.m.<br>Courtroom:  7 |

403729.02

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

NOTICE OF MOTION AND MOTION ....................................................................... iv

STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3)) .......................... v

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................. 2

III.    ARGUMENT ....................................................................................................... 4

        A.      PAD Lacks Standing to Enforce the Contract Between Green Light
                and EA. ................................................................................................... 4

        B.      PAD Alleges No Breach by EA of Any Contractual Duty. ................... 6

        C.      PAD Alleges No Damages Proximately Caused by the Alleged
                Breach. .................................................................................................... 8

        D.      PAD's Request for Legally Unavailable Relief Should Be Stricken. .... 10

IV.     CONCLUSION ................................................................................................... 11

i

403729.02

1

## TABLE OF AUTHORITIES

2

## FEDERAL CASES

3
*Bureerong v. Uvawas*, 922 F. Supp. 1450 (C.D. Cal. 1996)....................................................10

4
*Goodrich & Pennington Mortgage Fund, Inc. v. Chase Manhattan Mortgage Corp.*,
    No. 05-CV-636-L(POR), 2007 U.S. Dist. LEXIS 8307 (S.D. Cal. Feb. 5, 2007)....................5

5

*Int'l Marble & Granite of Colo., Inc. v. Congress Financial Corp.*,
6
    465 F.Supp.2d 993 (C.D. Cal. 2006) ................................................................11

7
*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005)..................................................................2

8
*Lazar v. Trans Union LLC*, 195 F.R.D. 665 (C.D. Cal. 2000) ...........................................5

9
*McEldowney v. Nat'l Conference of Bar Examiners*, 837 F. Supp. 1062 (C.D. Cal. 1993)............8

10
*Nat'l Rural Telecommunications Cooperative v. DIRECTV, Inc.*,
    319 F. Supp. 2d 1040 (C.D. Cal. 2003) ..........................................................4
11

*Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530 (9th Cir. 1984)..........................8
12

*State of Cal. Dep't of Toxic Substances Control v. Alco Pacific, Inc.*,
13
    217 F. Supp. 2d 1028 (C.D. Cal. 2002) ..........................................................10

14
*Weinstein v. Saturn Corp.*,
    No. C-07-0348 MMC, 2007 WL 1342604 (N.D. Cal May 8, 2007) ........................7
15

## STATE CASES

16

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal. App. 3d 442 (1990)...........8
17

*Cal. Emergency Physicians Med. Group v. PacifiCare of Cal.*,
18
    111 Cal. App. 4th 1127 (2003) ................................................................5, 6

19
*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371 (1990).....................6

20
*Nelson v. Anderson*, 72 Cal. App. 4th 111 (1999) ..........................................................4

21
*Sofias v. Bank of America*, 172 Cal. App. 3d 583 (1985)................................................5

22

## FOREIGN CASE

23

*Hadley v. Baxendale*, 156 Eng. Rep. 145 (1854)..................................................................8

24

## STATUTES

25

Cal. Civ. Code § 1559......................................................................................................5

26
Cal. Civ. Code § 3294....................................................................................................10

27
Cal. Civ. Code § 3300......................................................................................................8

28
Cal. Code Civ. P. § 1021.................................................................................................10

403729.02

**RULE**

Fed. R. Civ. P. 12 ................................................................................................... *passim*

**TREATISE**

1 Witkin Summary of California Law, Ch. I (Contracts) § 876 ...................................................11

ELECTRONIC ARTS INC'S NOTICE OF MOTION AND MOTION TO DISMISS OR, ALTERNATIVELY,
TO STRIKE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. C-07-4693-MMC

403729.02

1       TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2       PLEASE TAKE NOTICE that on November 9, 2007, at 9:00 a.m., or as soon thereafter

3   as may be heard, before the Honorable Maxine M. Chesney of the United States District Court

4   for the Northern District of California, defendant Electronic Arts Inc. ("EA") will, and hereby

5   does, move the Court pursuant to the Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and

6   12(f) for an Order dismissing the Complaint, or in the alternative, striking portions of plaintiff

7   People Against Drugs Affordable Public Housing, Inc.'s ("PAD's") prayer for relief.

8       EA moves for dismissal because PAD lacks standing and because the Complaint fails to

9   state a claim upon which relief can be granted.  In the alternative, EA moves to strike as

10  immaterial the portions of the prayer for relief that seek punitive damages, exemplary damages,

11  and attorneys' fees, because those forms of relief are unavailable as a matter of law.

12      This Motion is based on this Notice of Motion and Motion; the Memorandum of Points

13  and Authorities below; all pleadings and papers filed herein; oral argument of counsel; and any

14  other matter that may be submitted at the hearing.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

403729.02

**STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))**

1.     A parent corporation generally lacks standing to enforce its subsidiary's contract. Also, a third party only has standing to enforce a contract that expressly shows an intent to benefit the third party. PAD's subsidiary (Green Light Racing) – and not PAD – entered into the contract at issue here. Moreover, the contract does not show any intent to benefit PAD. Should the Complaint be dismissed for PAD's lack of standing to enforce the contract?

2.     To state a claim for breach of contract, PAD must allege the breach of some specified contractual duty. The contract expressly granted EA absolute discretion to do what PAD now characterizes as a breach. Should the Complaint be dismissed for failure to state a claim for breach of contract?

3.     The alleged breach must have proximately caused the damages claimed. Thus, general damages must have been foreseeable at the time the parties made the contract, and the defendant must have known – or should have known – of any special damages. PAD alleges damages that, on the face of the Complaint, could not have been foreseen at the time the parties made the contract – nor is there any allegation that EA knew or should have known of the potential for such damages. Should the Complaint be dismissed for failure to state a claim for breach of contract?

4.     Punitive and exemplary damages are not available in a breach of contract claim. Also, the prevailing party is entitled to attorneys' fees only where a contract or statute expressly confers that right. That right is not available here. Should the portions of PAD's prayer for relief seeking punitive damages, exemplary damages, and attorneys' fees be stricken?

# I.    INTRODUCTION

In April 2007, Green Light Racing (a NASCAR racing team) entered into a license agreement with Electronic Arts Inc., a developer and publisher of video and computer games. The agreement permitted, but did not obligate, EA to use any of Green Light's logos or other identifiable characteristics in EA's games. Consistent with the license agreement, EA used images of a Green Light vehicle in its *NASCAR 08* game, which was released in July 2007.

Plaintiff People Against Drugs Affordable Public Housing, Inc. ("PAD") claims it is a non-profit organization and the parent of Green Light. It alleges that EA breached the license agreement by including the image of the actual Green Light racing team truck in *NASCAR 08*, which differs from the fictitious design that PAD wanted EA to use. It claims this alleged breach has threatened its non-profit status and Green Light's continued viability, causing it millions of dollars in damage.

The law does not recognize the wrong alleged in the Complaint. For the following four independent reasons, the Complaint should be dismissed in its entirety or, in the alternative, should be stricken in part.

First, plaintiff PAD lacks standing because it is not a party to the contract it seeks to enforce, nor is it an intended third-party beneficiary. The Complaint therefore should be dismissed under Fed. R. Civ. P. 12(b)(1).

Second, even if PAD were a proper plaintiff, PAD does not and cannot allege that EA breached any contractual duty. PAD claims that EA used an image of the Green Light racing team truck in *NASCAR 08* that was different from the image that PAD wanted EA to use. That, however, is not a breach of the license agreement. The license agreement granted EA absolute discretion to include (or not include) any image of the Green Light racing team truck. EA had no obligation to use a fanciful rendering of the Green Light racing team truck instead of the image it used of the actual truck. Because PAD alleges no contractual duty that EA breached, the Complaint should be dismissed under Fed. R. Civ. P. 12(b)(6). Dismissal should be with prejudice because under the terms of the license agreement, neither PAD nor Green Light could allege that EA's use (or non-use) of any specific Green Light image in any specific game was a

1

403729.02

1   breach of the license agreement.

2       **Third**, PAD does not allege a viable theory of damages. The Complaint fails to explain

3   how EA's alleged conduct (*i.e.*, EA's including in a video game an image of the actual Green

4   Light Racing truck instead of the fictionalized image PAD claims it wanted) proximately caused

5   PAD's alleged injuries (that the publication of a newspaper article in the *Dallas Business Journal*

6   article has threatened the racing team's business and PAD's status as a non-profit organization).

7   The alleged damages are not foreseeable general damages. Nor are they special damages about

8   which EA is alleged to have known or should have known. On the face of the Complaint, the

9   true causes of PAD's alleged injuries clearly have nothing to do with EA, including PAD's

10  apparently aggressive interpretation of Federal tax law, a competitive business climate among

11  NASCAR teams, and the *Dallas Business Journal*'s reporting of and publication of its article

12  (whose accuracy PAD does not dispute). Because PAD's allegations of damages are fatally

13  flawed, the Complaint should be dismissed under Fed. R. Civ. P. 12(b)(6).[1]

14      **Fourth**, even if PAD had stated a claim properly, its request for punitive damages,

15  exemplary damages, and attorneys' fees should be stricken under Fed. R. Civ. P. 12(f), because

16  California law does not authorize the award of such damages in this case, as a matter of law.

17                    **II.    BACKGROUND**[2]

18      PAD claims to be a tax-exempt, non-profit charitable corporation whose "purposes are to

19  provide affordable housing to tenants in a drug-free environment and to educate teenagers about

20  the dangers of drug use." Exhibit 1 attached hereto (July 9, 2007 *Dallas Business Journal*

21  article)[3], at 4; Complaint ("Compl.") ¶ 1. While it is unclear how owning a NASCAR racing

---

[1] Green Light Racing is not a non-profit corporation. Therefore, even if it were a plaintiff, it could not assert a damages theory akin to PAD's: that the alleged breach threatens its not-for-profit status.

[2] Because the Court accepts all well-pled factual allegations as true in ruling on a motion to dismiss, *see Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005), EA sets forth the facts alleged in the Complaint and materials incorporated by reference into the Complaint. EA does not admit the truth of any of the facts set forth herein.

[3] Under the incorporation by reference doctrine, the Court may consider the *Dallas Business Journal* article attached as Exhibit 1 to this motion, "'whose contents are alleged in [the] complaint and whose authenticity no party questions.'" *Knievel*, 393 F.3d at 1076 (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999), and affirming dismissal).

2

1  team furthers its charitable purposes, PAD purports to be the sole owner of Green Light Racing,

2  a NASCAR truck team. Compl. ¶¶ 7-8; Ex. 1 (Article), at 1. Green Light and PAD are separate

3  corporations. Compl. ¶ 8.

4      In April 2007, Green Light – not PAD – entered into a Driver and Team License

5  ("License") with EA, a leading developer and publisher of video and computer games. Compl.

6  ¶ 9, 11 & Ex. A. Green Light granted EA the "<u>right and license, but not the obligation</u>, to use,

7  reproduce, perform and display (publicly or otherwise), broadcast, distribute and transmit the

8  names, trademarks, copyrights, word marks, service marks, trade dress and associated logos of

9  [Green Light]" and related materials relating to Green Light's sponsors and cars, "on, in and in

10 connection with the advertising and marketing of, Licensed Products." Compl. Ex. A ¶ I(b)

11 (emphasis added).[4]

12      Green Light promised, "[a]s reasonably requested by EA, [to] deliver to EA photographs,

13 models and other data, information or materials in [Green Light's] possession which display the

14 Team Cars, Team Marks, and/or the Sponsor Marks, and <u>which are necessary or desirable for EA</u>

15 <u>to authentically recreate the Team Cars</u>, Team Marks, and/or Sponsor Marks in the Licensed

16 Products." Compl. Ex. A ¶ II (emphasis added). Green Light further agreed to "cooperate

17 reasonably with EA in granting access to the Team Cars to allow EA to collect its own data and

18 information and to take photographs or shoot videotape of the Team Cars." Compl. Ex. A ¶ II.

19      The Complaint alleges that sometime after the License was executed, Green Light

20 provided EA with a rendering of Green Light's "Number 08" truck bearing the logos "People

21 Against Drugs" and "Be Drug Free." Compl. ¶ 13 & Ex. B. This rendering differed

22 substantially from the appearance of the actual Number 08 truck, which confines the "People

23 Against Drugs" logo to a 4-inch by 4-inch space on the truck. *See* Ex. 1 (Article), at 3. The

24 actual Number 08 truck is known as the "Garmin/GPS Store 08" truck, after its primary sponsor.

25 Ex. 1 (Article), at 2.

26

Paragraph 18 of the Complaint alleges the contents of the *Dallas Business Journal* article.

27 [4] "Licensed Products" include, among other things, certain "interactive software product[s]

28 published or developed by EA or under license from EA." Compl. Ex. A, at 3 ¶ 1.03. The
License identifies no specific EA products.

3

403729.02

1    In June 2007, the Dallas Business Journal interviewed PAD's executive director, Gene

2  Christensen, for an article entitled "Nonprofit Fuels Race Team" that examined the connection

3  between PAD and Green Light.  Compl. ¶ 18.  Mr. Christensen told the reporter that "his truck"

4  would be included in EA's *NASCAR 08* game, bearing the fictitious "People Against Drugs" and

5  "Be Drug Free" logos.  Compl. ¶ 18; Ex. 1 (Article), at 3.  The reporter then contacted EA.  In

6  response to the reporter's inquiries, EA said that in the *NASCAR 08* game, the "Number 08"

7  truck would appear as it does in the actual NASCAR racing circuit and, thus, would bear the

8  logos of the truck's primary sponsor: Garmin/GPS Store.  Ex. 1 (Article), at 3.

9    On July 6, 2007, the Dallas Business Journal published its article about the connection

10  between PAD and Green Light.  Ex. 1 (Article).  PAD alleges that the article "questioned the

11  honesty of Mr. Christensen and [PAD's] 501(c)(3) status."  Compl. ¶ 18.  PAD further alleges

12  that "[a]s a result of this article, [PAD's] non-profit status has been jeopardized and Green Light

13  Racing's long term viability has been compromised, all as the proximate result of the breach of

14  contract by [EA]."  Compl. ¶ 18.

15    EA released *NASCAR 08* on July 23, 2007.  Compl. ¶¶ 16-17.  PAD filed this action on

16  September 12, 2007.  EA now moves to dismiss the complaint in its entirety, or, in the

17  alternative, moves to strike portions of PAD's prayer for relief.

18                           **III.    ARGUMENT**

19  **A.    PAD Lacks Standing to Enforce the Contract Between Green Light and EA.**

20    PAD is not a party to the contract it seeks to enforce.  *See* Compl. Ex. A, at 1.  Instead,

21  Green Light – a separate corporation – entered into the license agreement with EA.  *See* Compl.

22  ¶¶ 1, 7, 8.  PAD does not have standing to enforce the License simply because the signatory,

23  Green Light, is PAD's wholly owned subsidiary.  "[A] parent corporation and its subsidiary are

24  legally distinct entities, and a contract under the corporate name of one is not treated as that of

25  both."  *Nat'l Rural Telecommunications Cooperative v. DIRECTV, Inc.*, 319 F. Supp. 2d 1040,

26  1057 (C.D. Cal. 2003).  To grant PAD standing solely because of its parent corporation status

27  would shield a parent from liability for the subsidiary's obligations (under the corporate law

28  principle of limited liability), while allowing the parent standing to enforce those very same

4

ELECTRONIC ARTS INC'S NOTICE OF MOTION AND MOTION TO DISMISS OR, ALTERNATIVELY,
TO STRIKE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. C-07-4693-MMC

403729.02

1    obligations.

2           As a non-party to the License, PAD only has standing to enforce that contract if it is an

3    intended third party beneficiary of the agreement. *Nelson v. Anderson*, 72 Cal. App. 4th 111,

4    130 (1999) ("One who is not a party to a contract has no right to enforce it unless he is an

5    intended third-party beneficiary of the contract."). But PAD has not alleged (and cannot allege)

6    – as it must – that the contract was "made <u>expressly</u> for the benefit of the third person [*i.e.*

7    PAD]." Cal. Civ. Code § 1559 (emphasis added).[5] "Expressly means in an express manner, in

8    direct or unmistakable terms; explicitly; definitely; directly." *Sofias v. Bank of America*, 172

9    Cal. App. 3d 583, 587 (1985) (quotations omitted). Thus, the intent to benefit PAD must

10   "appear[] from the terms of the contract." *Lazar v. Trans Union LLC*, 195 F.R.D. 665, 674-75

11   (C.D. Cal. 2000) (granting motion to dismiss without leave to amend, where the relevant

12   contracts showed no such intent).

13          No intent to benefit PAD appears anywhere in the License. *See* Compl. Ex. A. In fact,

14   the License makes no mention of PAD. *See id.* Where a contract shows no intent to benefit the

15   purported third-party beneficiary, the Complaint must be dismissed. *See Goodrich &*

16   *Pennington Mortgage Fund, Inc. v. Chase Manhattan Mortgage Corp.*, No. 05-CV-636-L(POR),

17   2007 U.S. Dist. LEXIS 8307, at *7 (S.D. Cal. Feb. 5, 2007) (granting motion to dismiss where

18   plaintiff claimed to be a third party beneficiary, but "no such intent appears from the terms" of

19   the agreements.).

20          Applying this rule, the California Court of Appeal recently affirmed the sustaining of a

21   demurrer without leave to amend where a group of emergency physicians sued a health care plan

22   for breach of insurance policies issued by the health care plan. *Cal. Emergency Physicians Med.*

23   *Group v. PacifiCare of Cal.*, 111 Cal. App. 4th 1127 (2003). The Court held that the physicians

24   were not third party beneficiaries of the insurance policies. *Id.* at 1138. The Court reasoned that

25   "[t]hird party beneficiary status is a matter of contract interpretation," and the "policies do not

26   _____

27   [5] The License provides that it "shall be governed by and interpreted in accordance with the
     substantive laws of the State of California (without regard to its choice of law rules) and the
28   copyright laws of the United States." Compl. Ex. A, at 6 ¶ 7.02. PAD acknowledges that
     California law should apply. Compl. ¶ 4.

403729.02

1   show an intention to benefit noncontracting providers [such as plaintiffs], who are not mentioned

2   in the contract." *Id.* As such, the physicians had failed to satisfy the requirement that a third

3   party beneficiary "'plead a contract which was made expressly for his benefit and one in which it

4   clearly appears that he was a beneficiary.'" *Id.* (quoting *Luis v. Orcutt Town Water Co.*, 204 Cal.

5   App. 2d 433, 441 (1962)). The same rule applies here: because the License shows no intent to

6   benefit PAD, PAD lacks standing to bring this action.

7        Because PAD is neither a signatory to the License nor an intended third party beneficiary,

8   PAD lacks standing. This action therefore should be dismissed under Fed. R. Civ. P. 12(b)(1).

9   **B.    PAD Alleges No Breach by EA of Any Contractual Duty.**

10       The Complaint must be dismissed for the separate and independent reason that it does not

11  allege an essential element of a breach of contract claim: EA's breach of some contractual duty.

12  *See Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1388 (1990) (elements

13  of breach of contract). The License expressly grants EA absolute discretion to include (or not

14  include) in its video games any of Green Light's "names, trademarks, copyrights, word marks,

15  service marks, trade dress and associated logos." Compl. Ex. A ¶ I(b). PAD alleges EA

16  breached the License when EA exercised its discretionary power and used in *NASCAR 08* the

17  image of the actual Green Light truck from the NASCAR racing circuit, "refused" to include the

18  fictionalized image of the truck PAD wanted EA to use, and did not seek "comment or approval

19  from Green Light as to the finished representation of the Number 08 truck."[6] Compl. ¶¶ 15-17.

20  PAD's allegations—even accepted as true—do not amount to a breach by EA of any contractual

21  duty owed to PAD or Green Light.

22       The License does not obligate EA to include any images of Green Light's trucks, or a

23  particular rendering of those trucks, in any video game – or in *NASCAR 08* specifically. Green

24  Light granted EA the "right and license, but not the obligation, to use, reproduce, perform and

25  display (publicly or otherwise), broadcast, distribute and transmit the names, trademarks,

26  copyrights, word marks, service marks, trade dress and associated logos of [Green Light]" and

27

28  [6] It is worth noting that the Complaint alleges that EA should have allowed Green Light, not plaintiff PAD, the right to "comment and approve."

ELECTRONIC ARTS INC'S NOTICE OF MOTION AND MOTION TO DISMISS OR, ALTERNATIVELY,
TO STRIKE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. C-07-4693-MMC

403729.02

1  related materials relating to Green Light's sponsors and cars, "on, in and in connection with the

2  advertising and marketing of, Licensed Products." Compl. Ex. A ¶ I(b) (emphasis added).[7]

3  Through the License, EA obtained the option to "use, reproduce, perform and display (publicly

4  or otherwise), broadcast, distribute and transmit" the enumerated items in "any interactive

5  software product published or developed by EA or under license from EA." Compl. Ex. A, at ¶

6  I(b) & 3 ¶ 1.03 (definition of "Licensed Products"). In granting EA the right and license, but not

7  the obligation to such use, the License gives EA complete discretion to include or not include

8  Green Light's renderings in any video game.

9      Nor does the License require EA to obtain "comment or approval" from Green Light

10  before using a Green Light logo or image. *See* Compl. ¶¶ 16-17. PAD is apparently referring to

11  Section II of the License, titled "Cooperation," but that section provides that "[a]s reasonably

12  requested by EA, [Green Light] will deliver to EA" team images and that "[Green Light] will

13  cooperate reasonably with EA" in granting EA access to Green Light cars. Compl., Ex. A ¶ II.

14  In other words, Green Light had the obligation to cooperate with and provide material to EA.

15  EA had no obligation to seek approval or comment from PAD or Green Light with respect to the

16  images that EA would use in any game.

17      Moreover, the express purpose for Green Light's "cooperation" obligation was to enable

18  "EA to authentically recreate the Team Cars, Team Marks, and/or Sponsor Marks." *Id*. No

19  provision of the License requires EA to include in *NASCAR 08* a fanciful car design that bears no

20  resemblance to the actual Green Light truck.

21      In *Weinstein v. Saturn Corp.*, No. C-07-0348 MMC, 2007 WL 1342604, at *2 (N.D. Cal.

22  May 8, 2007), this Court dismissed a claim for breach of a nonexistent contractual obligation.

23  There, the plaintiff sued Saturn Corporation for failing to enable the "OnStar" system in the

24  Saturn VUE vehicle to navigate automated phone systems. *Id*. The Court dismissed the claim

25  without leave to amend, reasoning that the vehicle sale contract at issue did not require the VUE

26  ─────────────────────────

27  [7] The License is the sole source of the parties' contractual obligations. PAD does not, and
cannot, allege that the parties agreed to any obligations beyond those set forth in the License,
because the License contains an integration clause stating that it "constitutes the entire

28  understanding between the parties hereto with respect to the subject matter hereof." Compl.

1  to have that feature. *Id.*

2  The same reasoning applies here. The License does not impose the contractual

3  obligations PAD asserts that EA breached. Moreover, in light of the plain language of the

4  License and its integration clause, PAD cannot allege facts that would constitute a breach. The

5  Complaint therefore should be dismissed with prejudice under Fed. R. Civ. P. 12(b)(6). *See*

6  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984) ("A complaint may

7  be dismissed as a matter of law for . . . : (1) lack of a cognizable legal theory or (2) insufficient

8  facts under a cognizable legal claim.").

9  **C.    PAD Alleges No Damages Proximately Caused by the Alleged Breach.**

10  This motion should be granted for an additional reason: PAD fails to allege damages

11  proximately caused by the alleged breach. *See* Cal. Civ. Code § 3300; *McEldowney v. Nat'l*

12  *Conference of Bar Examiners*, 837 F. Supp. 1062, 1064 (C.D. Cal. 1993) (granting motion to

13  dismiss where the alleged damages resulted from a "supervening cause").

14  In a breach of contract case, proximate causation requires that general damages be

15  foreseeable, or that the defendant knew or should have known of any special damages, under the

16  rule set forth in *Hadley v. Baxendale*, 156 Eng. Rep. 145 (1854), and recognized under California

17  law:

18  > First, general damages are ordinarily confined to those which
19  > would naturally arise from the breach, or which might have been
    > reasonably contemplated or foreseen by both parties, <u>at the time</u>
    > <u>they made the contract</u>, as the probable result of the breach.
20  > Second, if special circumstances caused some unusual injury,
    > special damages are not recoverable therefor unless the
21  > circumstances were known or should have been known to the
    > breaching party <u>at the time he entered into the contract</u>.

22  *Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal. App. 3d 442, 455-56 (1990)

23  (emphasis added).

24  Here, PAD alleges that "[a]s a result of [the *Dallas Business Journal*] article, [PAD's]

25  non-profit status has been jeopardized and Green Light Racing's long term viability has been

26  compromised." Compl. ¶ 18 (emphasis added). PAD claims, inexplicably, that "all" of these

27

28  Ex. A, at 6 ¶ 7.08.

403729.02

1   consequences are "the proximate result of the breach of contract by [EA]" and that PAD has

2   suffered $5,000,000 in damages. Compl. ¶¶ 18-19.

3          The injuries PAD alleges can in no way have been "reasonably contemplated or foreseen

4   by both parties, at the time they made the contract, as the probable result of the breach" of the

5   License. *Brandon & Tibbs*, 226 Cal. App. 3d at 455-56.  Moreover, PAD does not and cannot

6   allege that EA knew or should have known of any special circumstances that would give rise to

7   such damages upon a breach of the License.  There is no allegation that – at the time the parties

8   entered into the License in April 2007 – either party could have anticipated the *Dallas Business*

9   *Journal* article that was published in July 2007.  Nor is there any allegation that in April 2007,

10  EA knew or should have known of PAD's relationship with Green Light.

11         PAD's alleged damages fail the test of proximate causation because there simply is no

12  causal link between (i) EA's decision to include an image of the actual Green Light truck, and

13  not Green Light's fanciful rendering, in EA's *NASCAR 08* game, and (ii) the *Dallas Business*

14  *Journal*'s publication of the article entitled, "Nonprofit Fuels Race Team" (whose accuracy PAD

15  does not dispute).  EA could not have foreseen the facts that led to the publication of that article:

16         •   The *Dallas Business Journal* reporter independently decided to investigate the

17             unusual ownership by an anti-drug non-profit organization of a NASCAR team.

18             EA had nothing to do with that decision, and the Complaint does not allege

19             otherwise.

20         •   The reporter unearthed sufficient facts about the relationship between PAD and

21             Green Light to write a publishable article.  EA's conduct had nothing to do with

22             that circumstance, and the Complaint does not allege otherwise.

23         •   The *Dallas Business Journal* independently decided to publish the article.  Again,

24             EA had nothing to do with that decision, and the Complaint does not allege

25             otherwise.

26         Nor is there any causal link between EA's conduct and the alleged fallout from the

27  publication of the *Dallas Business Journal* article: "[PAD's] non-profit status has been

28  jeopardized and Green Light Racing's long term viability has been compromised." Compl. ¶ 18.

9

403729.02

1  Those consequences are not foreseeable results of the alleged breach:

2    • PAD's non-profit status would not be in jeopardy if the organization had

3      complied with Federal tax laws. EA had nothing to do with PAD's apparently

4      aggressive interpretation of those laws, and the Complaint does not allege

5      otherwise.

6    • EA cannot be blamed for Green Light's financial condition. Even before any

7      alleged breach by EA, Green Light faced financial pressures. Mr. Christensen

8      described Green Light as a "break-even proposition[]." Ex. 1 (Article), at 2.

9      According to the article, "the team's drug-education efforts have had to take a

10     back seat to raising money to keep the team competitive with big names." Ex. 1

11     (Article), at 2. EA is not to blame for any financial difficulties faced by Green

12     Light.

13  Because PAD alleges no damages proximately caused by EA's alleged breach, the

14  Complaint should be dismissed under Fed. R. Civ. P. 12(b)(6).

15  **D.    PAD's Request for Legally Unavailable Relief Should Be Stricken.**

16      For the reasons described above, the Complaint should be dismissed with prejudice. If,

17  however, the Court does not dismiss the Complaint in its entirety, it should strike PAD's prayer

18  for punitive and exemplary damages and attorneys' fees because they are not available in this

19  breach of contract action as a matter of law.

20      A motion to strike should be granted as to "any part of the prayer for relief when

21  damages sought are not recoverable as a matter of law." *Bureerong v. Uvawas*, 922 F. Supp.

22  1450, 1479 n.34 (C.D. Cal. 1996); *State of Cal. Dep't of Toxic Substances Control v. Alco*

23  *Pacific, Inc.*, 217 F. Supp. 2d 1028, 1046 (C.D. Cal. 2002) (granting motion to strike prayer for

24  attorneys' fees). PAD's improper request for three forms of relief that are unavailable in this

25  case as a matter of law – punitive damages, exemplary damages, and attorneys' fees – should be

26  stricken.

27      Punitive and exemplary damages may not be awarded for a breach of contract

28  unaccompanied by a tort. *See* Cal. Civ. Code § 3294(a) (exemplary and punitive damages are

10

1  available for "breach of an obligation not arising from contract"); 1 Witkin Summary of

2  California Law, Ch. I (Contracts) § 876 ("[P]unitive damages are never recoverable for breach of

3  contract, no matter how wilful or malicious, except where the wrongful act is also a tort.").

4  Because the Complaint fails to allege any tort, punitive and exemplary damages are unavailable

5  as a matter of law.

6      Nor may PAD recover its attorneys' fees in this action. A prevailing party is not entitled

7  to attorneys' fees in the absence of a contractual or statutory right to such fees. Cal. Code Civ. P.

8  § 1021; *Int'l Marble & Granite of Colo., Inc. v. Congress Financial Corp.*, 465 F. Supp. 2d 993,

9  1001 (C.D. Cal. 2006). The License does not entitle PAD to attorneys' fees. *See* Compl. Ex. A.

10  Nor does PAD allege any statutory right to attorneys' fees.

11      PAD's requests for punitive and exemplary damages, *see* Compl., at 6, and for attorneys'

12  fees, *see* Compl. ¶ 20, and 6, thus are unsupported by law. Those portions of PAD's prayer for

13  relief therefore should be stricken.

14                    **IV.    CONCLUSION**

15      For the foregoing reasons, the Court should dismiss the Complaint without leave to

16  amend or, in the alternative, should strike the portions of PAD's prayer for relief seeking

17  punitive damages, exemplary damages, and attorneys' fees.

18

19                              Respectfully submitted,

20  Dated:  October 3, 2007            KEKER & VAN NEST, LLP

21

22                              By:   s/R. James Slaughter

23                                 R. JAMES SLAUGHTER
                                   MICHAEL K. STERN
24                                 Attorneys for Defendants
                                   ELECTRONIC ARTS INC.
25

26

27

28

11

EXHIBIT 1

Nonprofit fuels race team - Dallas Business Journal:                                          Page 1 of 5

**Dallas Business Journal - July 9, 2007**
http://dallas.bizjournals.com/dallas/stories/2007/07/09/story2.html

# Dallas Business Journal

**BUSINESS PULSE SURVEY:** <u>Do you agree with Southwest Airlines? decision to tell passengers to</u>

## Nonprofit fuels race team

**Watchdogs question anti-drug funds' use for NASCAR trucks**

Dallas Business Journal - July 6, 2007 by <u>Dave Moore</u> Staff Writer

**STORY IMAGES**

   

About 17 years ago, a Garland charity set out to give schools a lesson plan to fight drug abuse.

The charity doesn't seem to have rewritten much curricula, but it sure has built up one heck of a real estate and NASCARå portfolio.

Federal tax returns from 1997 to 2004 show that the People Against Drugs Affordable Housing Agency has gone through $21 million in program-service expenses and built up about $3.5 million in assets, which include the Country Creek Apartments in Garland and Greenlight Racing Inc., a NASCAR truck team based in Mooresville, N.C.

Now the charity's founder, former drag racer Gene Christensen, is running for Congress against 25-year incumbent Republican Ralph Hall and former Frisco Mayor Kathy Seei.

And his unconventional approach to drug education has raised the eyebrows of some nonprofit observers.

"Is the race car team being operated to the benefit of the charity, or is it a vehicle for the team owner to fund a race team?" said Daniel Borochoff, founder of the American Institute for Philanthropy, an Illinois-based nonprofit watchdog group. "What's driving the race car team? Is it the charitable purpose of educating youth on drugs, or is it to allow him to fund his race-car interest or hobby?

"That's what shouldn't be going on," Borochoff said. "They really need to justify if it's in the highest and best use for the money."

Christensen said while the People Against Drugs lesson plan hasn't been picked up much in classrooms, its anti-drug message is being very effectively delivered through his NASCAR team, which is a subsidiary of the nonprofit.

"The truth is, race car drivers are idols, and NASCAR is an untainted sport," Christensen said. "NASCAR holds all the drivers up to high expectations."

But Borochoff said given the logic of racing cars to prevent drug abuse, "You could set up a nonprofit bordello to study sexuality."

In 2004, the most recent year available for financial review via IRS 990 tax returns, People Against Drugs had revenue totaling $4.3 million.

*All contents of this site © American City Business Journals Inc. All rights reserved.*

About half of that came from rents paid at the Country Creek Apartments, according to papers provided by Christensen. Most of the rest came from his nonprofit's other revenue-producing enterprise: Greenlight Racing.

Racing money doesn't mingle with housing money, Christensen said, and both operations are break-even propositions.

### A distant memory

People Against Drugs has outlasted McGruff the Crime Dog, herds of wannabe Roger Penskes and slum housing to put two pickup trucks in the NASCAR Craftsman Truck Series and to house more than 100 low-income residents in relative comfort at the 296-unit Country Creek apartment complex at 1702 N. Jupiter Road.

But most people who've watched a People Against Drugs truck compete, or who've lived in its apartment complex, might not have a clue that the organization exists.

The only hint to passers-by that Country Creek is connected to the charity is a faded, rusty sign that says "People Against Drugs Office" that hangs outside a converted apartment just south of the apartment manager's office.

The office has become a collecting point for paint brushes, baseball hats, a bag of corn chips and boxes of photographs showing off Christensen's political connections and community involvement.

Pointing to one picture, he says People Against Drugs donated more than $1,000 to help treat "Trooper," a blind Labrador retriever that wandered out into the street and was struck by a vehicle. When asked what paying a dog's vet bill has to do with drug prevention, he said the dog would visit senior citizen homes. Later, he faxed the Dallas Business Journal an article indicating the dangers of elderly drug abuse.

Above and to the right of the dog's picture is a letter dated September 1998 from the Office of National Drug Control Policy, urging Christensen to help find a way to enlist NASCAR into an anti-drug education campaign. Its writer, Judi Kosterman, has since left the office, as have many who Christensen has encountered in his 17 years in the anti-drug effort.

People Against Drugs is a distant memory to Garland police spokesman Joe Harn. "When he was starting that and talking about that, that's when I was assigned to (the) narcotics" unit, Harn said. "I haven't heard about (the charity) for awhile."

### Racing for drug education

Christensen said he introduced race cars into the drug-education picture in 1989, when he drove drag cars in California. He said he worked with "McGruff" at the Orange County Sheriff's office to take children to the races, and spoke to them about drug abuse.

He met NASCAR driver Bobby Dotter at a West Coast NASCAR event, where Dotter was winning races. Christensen and Dotter pooled their resources and moved to the Craftsman Truck series, where competing was less expensive.

The pair introduced Greenlight Racing to the truck series in 2001 under the umbrella of People Against Drugs. Today they own and consistently race two Chevrolet Silverado pickups -- one known informally as the "Lester Buildings 07" car, the other as the "Garmin/GPS Store 08" car, after their primary sponsors -- and the team is entirely funded by People Against Drugs. The truck-sponsorship fees are paid to Greenlight Racing, which does business as People Against Drugs.

Dotter says that, lately, the team's drug-education efforts have had to take a back seat to raising money to keep the team competitive with big names like Jack Roush, who seems to have an inexhaustible supply of sponsorship cash and 24 national championships under his belt.

"Back four years ago or so, when I was the full-time driver for the team, we'd, throughout the year,

in different race markets, we'd go and hit schools with the truck and I'd talk to the kids about how I got into racing and staying clean and staying away from stuff, and how that was good," said Dotter, who lives in North Carolina and manages the team's racing operations. "But as we've gotten to the point now where we're constantly changing drivers and bringing drivers in and stuff, it's not been as easy to do that."

Christensen, however, maintains that he still goes out to schools and talks about the dangers of drugs. And, until recently, he pointed to the promise that EA Sports, a California videogame producer, intended to feature a "People Against Drugs 08" truck with the prominent message, "Be Drug Free," in its new "NASCAR 08" videogame, which is expected to be released shortly.

Christensen said the exposure to People Against Drugs would be worth millions of dollars, given the playing time children and young adults will pour into the game.

But, in an e-mail to the Dallas Business Journal, Randy Chase, product manager for EA Sports, said the Greenlight truck will carry the "Garmin/GPS Store" banner in the videogame.

Christensen said that, because the charity has the right to OK any Greenlight truck likeness in the "NASCAR 08" game, he may sue EA Sports unless it changes the car's logo in the game.

"Sponsors pay for that," he said. "Garmin declined to pay (Greenlight). That's a no-no."

Chase couldn't be reached at presstime about whether the threat of litigation by the nonprofit would alter his plans for the Greenlight car in the videogame.

### Exposure time
Right now, an orange People Against Drugs decal occupies just a 4-inch-by-4-inch space behind the cab on both sides of the 07 and 08 trucks in the Craftsman Truck Series, among many other stickers.

Eric Wright of Joyce Julius & Associates Inc. in Ann Arbor, Mich., which studies the advertising value of media coverage, estimated that the Garmin/GPS Store truck attracted $229,245 worth of free media exposure in 2006, while the Lester Buildings vehicle landed $239,300 worth of footage in 2006.

"Thus far, the People Against Drugs logo has not received any clear and in-focus exposure time during the truck event telecasts," Wright told the Business Journal in an e-mail.

Christensen said the value of People Against Drugs' involvement in owning a NASCAR team is the access the charity provides to drivers and team owners.

Charity watchdog Borochoff pointed out that, instead of owning a team, People Against Drugs could simply sponsor a truck unrelated to the charity to get its message out, similar to how other NASCAR teams work.

But Christensen said People Against Drugs wouldn't be able to keep any assets if it simply paid a team to appear at drug-free events.

"You'd only get three to four appearances out of them" a year, Christensen said. "That wouldn't be able to put the message out. People Against Drugs was designed to be self-sufficient. That's why the (Resolution Trust Corp.) allowed us to create this."

### Real estate's role
About 20 years ago, Christensen said, he sobered up and, with the help of friends, launched the People Against Drugs charity to prevent others from falling into addiction.

One key element of the plan, according to Christensen, was to fund the venture through real estate purchased through the Resolution Trust Corp. The RTC was formed by the federal government to

dispose of properties left behind when savings and loans failed in the 1980s.

A bumper crop of defaulted properties and reasonable land prices drew Christensen to North Texas. He'd been sober for a year when he moved here in 1988, he said, and thought up the idea of People Against Drugs with fellow members of 12-step programs.

He met his former wife, Carrie Flodter, at a 12-step-program meeting in 1989. A year later, Christensen and others, including Flodter, filed for People Against Drug's tax-exempt status with the federal government and in the state of California, where Christensen was born.

Tax exemptions allow organizations to avoid paying federal income taxes, and some tax-exempt groups can also qualify for property-tax exemptions. Dallas Central Appraisal District records show that the Country Creek Apartments is exempt from property taxes; a similarly valued Garland apartment complex had estimated taxes of more than $200,000 in a one-year period.

The People Against Drugs mission statement that was filed with the federal government makes no mention of racing cars or real estate. Nor do the articles of nonprofit incorporation filed in 1991 in California; those documents refer to promoting a "national drug education program beginning at the grade-school level and extending through high school."

A 1992 nonprofit filing in Florida described the charity's purpose this way: to "set and develope (sic) drug free and gang free living environments." About the same time, People Against Drugs was granted nonprofit status in Texas to provide and teach drug- and gang-free living.

Not long afterward, the charity paid $3.9 million for Garland's Country Creek Apartments, which Christensen said was drug-ridden and rundown at the time.

He planted the palm trees outside the complex's western-most pool himself, he said, and, for awhile, stayed in one of the apartments there. Since at least 1997, the charity has said in its tax return that its purposes are to provide affordable housing to tenants in a drug-free environment and to educate teenagers about the dangers of drug use.

While Christensen showed a 48-page People Against Drugs lesson plan to the Business Journal, he said he couldn't disclose which, if any, schools have adopted the curriculum, citing confidentiality rules.

In 2000, when Christensen began divorce proceedings against Flodter, the five-person People Against Drugs board of directors gave Christensen a $119,260 loan to help him find a place to live, according to the charity's 2000 tax return.

Christensen remarried last year. He and his wife, Cheryl, recently bought a $364,000 house in rural Celina, in Collin County, and the couple are planning to travel to Argentina soon to watch prospective drivers race. Christensen said he will pay for the trip out of his own pocket.

His salary is $145,000 a year at People Against Drugs. He said he draws no salary for his work on the race team.

He's able to afford these expenses, he said, because the nonprofit has a retirement fund set aside for him.

Christensen says that none of the money from People Against Drugs has ever benefited him directly, other than his paycheck.

Though he's been surrounded by cars most of his life, he said, Greenlight Racing and People Against Drugs is a 60-hour-a-week job for him, not a hobby.

"A hobby is golf," Christensen said. "I'm promoting a message."

**Fresh perspective**

June 8 signaled the start of Christensen's slow retreat from People Against Drugs.

That's when, just before the Sam's Town 400 truck race at Texas Motor Speedway, he announced his intention to run against incumbent Ralph Hall for Hall's seat in the 4th Congressional District Republican primary.

Christensen has named Suzanne Gosselin, who he also knows through the 12-step program, as his replacement director for the charity.

According to the Center For Responsive Politics, a nonpartisan group in Washington, D.C., that tracks campaign contributions, Christensen donated $40,400 to Republican causes and candidates at the national level between 1996 and 2006.

He's running for Congress, Christensen said, because he thinks he can bring a fresh perspective to Washington.

*dmoore@bizjournals.com | 214-706-7112*

| Contact the Editor | Need Assistance? | More Latest News → |